CARSON v. THE IOWA CITY GASLIGHT COMPANY *et al.*

BLOOM v. THE SAME.

1. **Corporations:** ULTRA-VIRES CONTRACT : RIGHT OF STOCKHOLDERS TO RESTRAIN. The plaintiffs in these cases were largely interested in a company organized for the purpose of lighting the city of Iowa City with electricity. The defendant gaslight company had no authority to engage in the manufacture and sale of that form of light, but it nevertheless entered into an *ultra-vires* contract with the city for that purpose. There was a rivalry between the two companies, and plaintiffs, with a view to defeat the execution of the *ultra-vires* contract, purchased a large number of shares of the stock of the gaslight company, which the president thereof (the owner of the shares) had pledged to secure a loan, and which, upon his failure to redeem them, the pledgee sold under the terms of the contract of the loan. The *ultra-vires* contract was as yet wholly unexecuted, *Held* that plaintiffs, as stockholders by virtue of such purchase, had the right to enjoin the execution of the *ultra-vires* contract, and the expenditure of any money in reference thereto, and that the officers of the gaslight company could not defeat that right by refusing to transfer the stock on the books of the company, but that equity would compel such transfer, and the recognition of plaintiffs as the owners of the stock.

2. **Pledge:** SALE OF BY PLEDGEE: PRIVATE SALE UNDER CONTRACT : ADEQUACY OF CONSIDERATION. The owner of five hundred shares of the common stock of a corporation, of the face value of fifty thousand dollars, but which represented no real value in property, and which would draw dividends only after an annual dividend of six per cent. should be paid upon the preferred stock, which was equal to the full value of the company's assets, pledged such shares, with other stocks of the face value of fifty-one thousand dollars, to secure a loan of thirty thousand dollars. The contract of pledge permitted the pledgee, upon a failure to pay the loan when due, to sell the shares, without advertisement or notice, at public or private sale. The loan was overdue, and the pledgee had repeatedly, but in vain, demanded payment for more than six weeks, when he sold the five hundred shares of stock at private sale, without notice, for the sum of seven thousand dollars. *Held* that the sale was valid, being in compliance with the terms of the contract, and that, considering the uncertain value of the stock, it could not be held void on the ground that the consideration was inadequate.

Carson v. The Iowa City Gaslight Co.

*Appeal from Johnson District Court.*—HON. S. H. FAIRALL, Judge.

FILED, MAY 23, 1890.

THESE cases were submitted upon the same abstracts and arguments, and involve the same questions, and they will be determined in one opinion. They are actions in chancery, and involve the ownership of fifty thousand dollars of stock in the Iowa City Gaslight Company, a corporation organized under the laws of this state, and other questions pertaining to certain acts of the incorporation and its officers. There were decrees for the plaintiffs, and defendants appeal.

*A. E. Swisher* and *Baker & Ball*, for appellant.

*Ranck & Wade* and *Joe A. Edwards*, for appellees.

ROTHROCK, C. J.—I. Before proceeding with a statement of the matters in controversy in the case, we deem it proper to say that the abstract of appellants as presented in this court is not really an abstract, but appears to be a mere copy of the transcript. It contains one hundred and seventy-five pages of closely-printed matter. Our first thought, upon examining the abstract, was to set aside the submission, and order that a proper abstract be filed; but, as it appeared to us that the decrees of the district court must be affirmed, and appellants would be required to pay the necessary costs made in any event, it would not abridge our labor to be required to take up and consider the case at a future time. It is further to be said that the case is important in the amount involved, and we suppose that counsel for appellants were desirous that all the facts should be duly presented to the court.

It appears from the record that on the second day of January, 1888, the defendant J. K. Graves, with one R. E. Graves, executed and delivered to the First National Bank of Chicago an instrument in writing, of which the following is a copy:

1. CORPORATIONS: ultra-vires contract: right of stockholders to restrain.

"$15,000. CHICAGO, January 2, 1888.

"Four months after date, we promise to pay to the order of the First National Bank of Chicago, at their office, fifteen thousand dollars, for value received, with interest at the rate of seven per cent. per annum after date, having deposited with said bank as collateral. security for payment of this liability of ours to said bank, due or to become due, or that may be hereafter contracted, the following property, viz. :

250 shares American Coal Co...........$25,000
264 shares Western Union Fuel Co...... 26,400
500 shares Iowa City Gaslight Co....... 50,000

The market value of which is now $———, with the right to call for additional security should the same decline ; and, on failure to respond, this obligation shall be deemed to be due and payable on demand, with full power and authority to sell and assign and deliver the whole of said property, or any part thereof, or any additions thereto, at any broker's board or at public or private sale, at the option of said bank or its assigns, and with the right to be purchasers themselves at such broker's board or public sale, on the non-performance of this promise, or the non-payment of any of the liabilities above mentioned, or at any time or times thereafter, without advertisement or notice, and, after deducting all legal or other costs and expenses for collection, sale and delivery, to apply the residue of the proceeds of such sale or sales so to be made to pay any, either or all of said liabilities, as said bank or its president or cashier shall deem proper, returning the overplus to the undersigned.

"J. K. GRAVES.
"R. E. GRAVES."

On the fourth day of February, 1888, a note in like amount was given by said parties to said bank. It was in the same form as the instrument above set out, and the same stocks were pledged for its payment. These notes represented a loan of thirty thousand

dollars made by said bank to said J. K. Graves. It was an ordinary bank loan, made on the eighth day of January, 1885; and the notes above described were the ninth renewals of the loan. No part of the principal sum was paid at any renewal. The notes were all made on four months' time, and the said stocks were originally pledged as security for the loan, and they remained as security through all the renewals. It will be observed that the note above set out became due on the fifth day of May, 1888. The other note, for fifteen thousand dollars, became due one month later.

The Iowa City Gas Company, by its articles of incorporation, is empowered to manufacture "gas, coke and coal tar," and sell the same, in Iowa City. It has no authority to carry on any other business or engage in any other enterprise. On the fifteenth day of December, 1888, it entered into a contract with the city of Iowa City, by which it agreed to establish an electric-light system, and light the streets of the city with electricity. The contract set out in full the agreement of the parties, including all details as to the number and kinds of electric lights to be furnished, and the price to be paid therefor. The defendant Graves was the president, principal stockholder, and manager, of the gas company. It was organized in 1882 upon a stock basis of one hundred thousand dollars. There were fifty thousand dollars of preferred stock, and the fifty thousand dollars of common stock, which was afterwards pledged to secure the said loan of thirty thousand dollars from the First National Bank of Chicago. When the company was organized, it bought a gas plant at Iowa City, for which it paid forty thousand dollars in the preferred stock of the new company. This absorbed all of the preferred stock but ten thousand dollars. Some repairs and betterments were made to the old plant, but not to any considerable extent, so that the fifty thousand dollars of common stock did not represent anything of real value. It was issued without the payment of anything therefor, either by Graves or any

one else. It had no value founded upon any considera-
tion paid therefor. Its value depended upon the
future net earnings of the corporation over and above
six per cent. annual dividends, which was guaranteed
to be paid on the preferred stock.

Some time before the contract was made to furnish
the city with electric lights, an electric-light company
was organized at Iowa City, in which the plaintiffs
Carson and Bloom were largely interested. There was
a rivalry between the two companies as to which should
furnish the city with light. An attempt was made to
compromise the matter. It was conceded that the gas
company had agreed to furnish the electric lights at a
less sum than would be remunerative to any company.
No compromise was effected, and the plaintiff Carson
went to Chicago, and, on the twenty-second day of
December, 1888, he purchased the fifty thousand dollars
of gas stock from the said First National Bank for
seven thousand dollars, took an assignment of the
certificates of stock, and, upon his return to Iowa City,
assigned one-half thereof to the plaintiff Bloom. The
certificates were presented to the secretary of the gas
company with the request that the stock be transferred
to the plaintiffs upon the books of the company, which
the secretary, under the direction of Graves, refused to
do. Graves claimed that the purchase of the stock by
Carson was illegal and void, and he tendered to Carson
the sum of seven thousand dollars and interest, and
demanded the certificates, which were refused by Carson ;
and these actions were commenced to compel a transfer
of the stock to the plaintiffs, and to require the officers,
agents and servants of the gas company to recognize
the plaintiffs as the owners of the said fifty thousand
dollars of stock, and to restrain the gas company, its
officers and agents, from performing said electric light
contract, and to restrain the said gas company from
incurring any indebtedness for any purpose, except for
the proper and necessary expenses of making gas in
Iowa City, and restraining said company from buying

apparatus, machinery, or in any manner increasing the expenses or liabilities of the company for carrying out said electric-light contract. The defendant Graves insisted on the trial that the purchase of the stock by Carson was void, because Carson and Bloom, at the time of the negotiations for a settlement of the controversy as to which company should furnish the electric light, agreed and promised Graves that they would loan him seven thousand dollars to take up the stock pledged to the bank. This is denied by Carson and Bloom; and, without setting out the evidence, it is sufficient to say that, conceding that the fact in controversy is material, we do not think it is established by the evidence. It is also claimed that Carson and Bloom acted in bad faith with Graves; that, in the course of the negotiations, they learned from Graves that the stock in question was pledged to the bank; and that they betrayed and deceived him by going to Chicago and purchasing it from the bank at much less than its real value. This charge of bad faith is elaborately presented in the record and in argument. It is to be conceded that Graves did not know that Carson intended to buy the stock, and that in that respect he was deceived. But the unbiased reader of the evidence will arise from its perusal with a firm conviction that these parties dealt with each other at arms-length. It must be conceded that the gas company had no power to contract with the city to furnish electric lights. It made a void contract with the city to furnish lights at less cost than they could be furnished, for no other purpose than to counteract the rivalry of the electric-light company, represented by Carson and Bloom. It was to be expected that Carson and Bloom would defeat the contract if they could, and they had the undoubted right to do so. They had the right to purchase every dollar of the gas-company stock from any holder of the certificates of stock who had the right to sell the same; and the charge that they abused the confidence of Graves by using information acquired from him, that stock was

pledged to the bank, is not sustained by the evidence. Carson knew that fact long before there were any negotiations between the two companies. It is claimed, however, that Carson and Bloom have no right to question the electric-light contract made between the gas company and the city, because it was made and completed before Carson purchased the stock of the bank. But it was *ultra vires*, was not performed, and if the bank had the right to sell stock to Carson, the company could not, by wrongfully refusing to transfer the stock on the books of the company, prevent Carson and Bloom, his assignee, from demanding that the contract with the city be canceled. We might cite authority sustaining this proposition, but it is unnecessary.

We have thus disposed of every material question in the case but one, which we will now proceed to consider.

II. The question referred to is, did the bank, as pledgee of the stock, have the right to sell the same to Carson for seven thousand dollars? It is

2. PLEDGE: sale of by pledgee: private sale under contract: adequacy of consideration.

insisted by counsel for appellants that the sale was made by the bank without any demand on Graves for the payment of the notes, and that a demand was necessary to authorize a sale. Counsel have discussed at length the question whether a demand was necessary. We must be excused from entering upon an examination of that question. We find from the evidence that a demand was made for the payment of these notes long before the sale. The note above set out became due in May, 1888, and Carson bought the stock, December 22, in the same year. For several weeks before Carson made the purchase, the bank had been urging Graves to make a settlement or payment of the notes. An agent was sent to Iowa City to investigate as to the value of the gas stock. The bank offered to take twenty thousand dollars in full payment of the thirty thousand dollars and interest, and urged Graves to close up the transaction. These facts are shown by written

correspondence between the bank and Graves. It is true that the word "demand" was not used in any letter from the bank to Graves. This was not necessary. The whole correspondence shows that the bank was pressing Graves for payment, and that he was making efforts to raise the money. In the face of these facts, counsel ought not to ask this court to determine the abstract question whether, under such a written pledge as this, a demand was necessary. The question is not in the case. It is further claimed that no notice was given by the bank to Graves that a sale of the stock would be made. This was not necessary, because the written pledge expressly waives notice. It is urged that this does not mean notice to Graves, but public notice. A mere reading of the writing is a sufficient answer to this objection.

We have, then, a contract of pledge where no notice of the sale was required, and where a demand for payment was made and frequently repeated for more than six weeks before the sale. At common law, in the absence of stipulation between the parties to the contrary, a sale of the thing pledged must be at public auction. But, where the parties stipulate in the writing making the pledge that the sale may be private, without notice, and without demand, a sale made in the manner provided for by the contract is valid. See Jones, Pledges, secs. 602–615. There is no reason why the parties may not waive the requirements of demand and notice; and, although counsel have cited many authorities, there is not one of them which holds that these requirements may not be waived by the contract.

It is claimed that the sale was void because it was for a grossly inadequate sum. It is not shown that there was any collusion between the officers of the bank and Carson, nor that the bank was in any way influenced by statements or representations made by Carson. It is true there is evidence to the effect that the stock was of the value of thirty thousand dollars, or more, and then, again, there is evidence that it had no market value.

The bank was fully aware of the situation. As we have said, an agent was sent to Iowa City for the very purpose of ascertaining its value. A most potent fact as bearing upon its value is that the bank urged and insisted that Graves should pay twenty thousand dollars⁹ in full discharge of the debt, and take back the pledged stocks. The fact that the gas company had just made a contract which it had no power to perform would have a marked effect upon the value of the common stock. But, above all, this was stock which was issued without anything in money or property being paid therefor. The holder of it is entitled to no dividend unless the net earnings amounted to more than six per cent. on the preferred stock. Whether it had any real, actual, substantial value, no man could tell. Any estimate as to its value was purely speculative. In our opinion, the decree of the district court should be                                    AFFIRMED.